## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Docket No. 2:10-cr-00158-NT |
| | ) |
| WAYNE COLLAMORE, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON SUPPLEMENTAL MOTION FOR COMPASSIONATE RELEASE**

Before me is Defendant Wayne Collamore's supplemental motion for compassionate release (ECF No. 76), which the Government opposes (ECF No. 81). The parties participated in a virtual evidentiary hearing on Mr. Collamore's motion on May 12, 2025. For the following reasons, the motion is **GRANTED**.

## BACKGROUND

Mr. Collamore is 75 years old and is incarcerated at the low-security Federal Correctional Institution ("**FCI**"), Coleman in Sumterville, Florida. *See* Gov't's Resp. to Def.'s Suppl. Mot. for Sentence Reduction ("**Suppl. Resp.**") 2 (ECF No. 81).[1] In March of 2011, U.S. District Judge George Z. Singal sentenced Mr. Collamore to 210 months in prison and five years of supervised release for escaping federal custody and possessing a firearm as a prohibited person. J. in a Crim. Case 1–3 (ECF No. 21). Based on Mr. Collamore's projected release date of December 6, 2027, he has now served approximately eighty-three percent of his sentence. He will be eligible for

---

[1]  *See also FCI Coleman Low*, FED. BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/col (listing address in Sumterville, Florida) (last visited May 19, 2025).

home detention on June 6, 2027. Gov't's Resp. to Def.'s Mot. for Compassionate Release ("**Resp.**") (ECF No. 68) Ex. 5, at 5 (ECF No. 68-5).

Before recounting the conduct that led to Mr. Collamore's current incarceration, I describe his relevant background, beginning with his distinguished military service.

## I.    Military Service & Family Tragedy

Mr. Collamore enlisted in the United States Army in 1968. He was seventeen. He began his service in North Carolina and was reassigned to Vietnam, where he served until 1970. By all accounts, Mr. Collamore's military service was outstanding. He consistently received the highest marks from his superiors. He was awarded multiple medals and badges for his achievements and heroism, including an occasion when he rescued numerous wounded soldiers from active combat. Revised Presentence Investigation Report ("**PSR**") ¶ 76; Movant's 18 U.S.C. § 3582(c)(1)(A) Mot. for Sentence Reduction Pursuant to § 3582(c)(1)(A) and the First Step Act ("**Mot.**") 4, 6–7 (ECF No. 63).[2]

Mr. Collamore's service was interrupted by family tragedy in 1970, when his eldest brother died by suicide at age twenty-three after returning home following his own three tours in Vietnam. Mr. Collamore obtained emergency leave to return home

---

[2]    *See* Movant's 18 U.S.C. § 3582(c)(1)(A) Mot. for Sentence Reduction Pursuant to § 3582(c)(1)(A) and the First Step Act ("**Mot.**") Ex. 8, at 1 (No. 63-9) (document reflecting a Bronze Star Medal awarded to Mr. Collamore in 1969 "for heroism in ground combat"); Mot. Ex. 9, at 4 (letter presenting Mr. Collamore with a Brave Eagle Coin in recognition of his "willingness to give above and beyond the call of duty"); Mot. Ex. 9, at 5 (reflecting "excellent" conduct and efficiency ratings from 1968 to 1971); Appl. for Compassionate Release Pursuant to Title 18 U.S.C. 3582(c)(1)(A) (ECF No. 51) Ex. 4, at 44 (ECF No. 51-4) (letter of support written in 2020 by a wounded soldier whom Mr. Collamore rescued during combat in Vietnam in 1969).

to Maine. While home, Mr. Collamore learned that his mother had end-stage brain cancer. Unwilling to abandon her, Mr. Collamore went absent without leave ("**AWOL**") from the Army in May of 1970 and never returned to Vietnam. His mother died one year later at age forty-six. Mot. 4–5; PSR ¶¶ 67, 76.

## II.     Early Criminal Activity

Before Mr. Collamore's military service, he had never committed a crime. But at age twenty, not long after returning from Vietnam and in the wake of both family deaths, Mr. Collamore committed his first offenses. Many of those early offenses involved conduct that Mr. Collamore carried out for survival while on the run. For example, at age twenty-one, while Mr. Collamore was either AWOL from the military or had fled state custody, he broke into buildings seeking shelter, into a house to steal clothing, and into an elementary school to steal cartons of milk. Mr. Collamore says that, around that time, he spent thirty days in observation at a mental health institution in Augusta, Maine, pursuant to a court order. From 1970 to 1985, Mr. Collamore committed a steady series of crimes, almost exclusively burglaries, thefts, and escapes from custody. PSR ¶¶ 37–55, 70.

## III.    Armed Career Criminal Offenses & Current Incarceration

In September of 1985, Mr. Collamore was convicted of being a felon in possession of a firearm. Because of his prior offenses, the firearm conviction triggered a fifteen-year mandatory minimum sentence under the Armed Career Criminal Act

("**ACCA**").[3] He was released from custody in 1997, and shortly after, he was rearrested for supervised release violations and other crimes. Mr. Collamore cycled in and out of prison for over a decade until April of 2010, when he was released to serve the remainder of his sentence at a nonsecure Federal Bureau of Prisons ("**BOP**") halfway house in Portland, Maine. PSR ¶¶ 2, 56.

The offense underlying Mr. Collamore's current incarceration occurred on May 28, 2010, just over one month after he arrived at the halfway house. That day, Mr. Collamore left for his job in Falmouth, Maine, as permitted. But instead of returning to the halfway house after his shift, he fled in a rented car. Less than two weeks later, law enforcement apprehended him in a different vehicle. Once in custody, Mr. Collamore admitted to possessing a gun, which police later recovered. PSR ¶¶ 2–5.

Mr. Collamore pleaded guilty to escape in violation of 18 U.S.C. § 751(a), and to possessing a firearm as a prohibited person in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Because of Mr. Collamore's criminal history, the new firearm offense again triggered the ACCA's fifteen-year mandatory minimum. J. in a Crim. Case 1; PSR ¶ 33.

Before sentencing, Mr. Collamore took responsibility for his crimes and acknowledged that he needed mental health treatment. He admitted that he had fled on the day of his offense because he was struggling with the "ambiguity" of the

---

[3]     The Armed Career Criminal Act ("**ACCA**") applies a fifteen-year mandatory minimum sentence for any person who commits a firearm offense under 18 U.S.C. § 922(g) and, as relevant here, has "three previous convictions" for "a violent felony." 18 U.S.C. § 924(e)(1). A "violent felony" either involves "the use, attempted use, or threatened use of physical force"; is an offense of "burglary, arson, or extortion"; involves "explosives"; or "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(i)–(ii).

halfway house and because he had received a disciplinary report at work for a cash register discrepancy (it was over by ten dollars because a customer had refused her change). He explained that he flees when he feels unable to cope, and he clarified that he had bought a gun so he could survive "in the woods," which was where he had planned to hide. He said he was "disappointed" in himself and called his behavior "a problem, not something [he] consciously want[ed] to do." PSR ¶¶ 9–11, 77.

In a presentence report prepared in 2011, the United States Probation Office described a psychological evaluation Mr. Collamore had received in 2010, which had led to his first official diagnosis of post-traumatic stress disorder ("**PTSD**"). Mr. Collamore said during the evaluation that his combat military service "had changed him." The evaluator concluded that unless Mr. Collamore received "appropriate treatment for his experience in Vietnam," he would "continue to run." PSR ¶¶ 72, 91a, 92a. Judge Singal sentenced Mr. Collamore to two concurrent prison terms—210 months for the firearm offense and sixty months (the statutory maximum) for escape—and five years of supervised release. J. in a Crim. Case 2–3; PSR ¶¶ 80–81.

## IV.    Military Discharge Designation & Mental Health Diagnoses

Because of Mr. Collamore's civilian convictions, in 1972, the Army changed his discharge designation from "honorable" to "undesirable." According to Mr. Collamore, during one of his first prison terms in the early 1970s, he knew he needed mental health support and tried to obtain services from the United States Department of Veterans' Affairs ("**VA**"). He learned that his discharge designation made him

ineligible for VA benefits. Between 1973 and 2014, Mr. Collamore tried repeatedly but unsuccessfully to change his discharge status. Mot. 5.[4]

Finally, in 2019, a VA volunteer brought Mr. Collamore's case to the attention of a retired Army colonel, who collaborated with a United States Senator to change Mr. Collamore's discharge designation. Mot. 7. In 2023, the VA evaluated Mr. Collamore, diagnosed him with a trauma and stress-related disorder, and gave him a seventy percent disability rating, which finally qualified him for VA services and benefits. The VA made its determination retroactive to January of 2019. Mot. 7; Mot. Ex. 11, at 1 (ECF No. 63-11) (VA "rating decision" dated May of 2023).[5]

## V.    Previous Motions for Compassionate Release & Current Petition

In late 2020 and early 2021, Mr. Collamore filed his first two compassionate release requests based on concerns about COVID-19, which were both denied. *See* Order on Mot. for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A) (Compassionate Release) ("**2020 CR Order**") (ECF No. 58); Order on Mot. for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A) (Compassionate Release) (ECF No. 62).

---

[4]    *See also* Mot. Ex. 7 (ECF No. 63-7) (1972 letter furnishing Mr. Collamore with an "Undesirable Discharge"); Mot. Ex. 8 (ECF No. 63-8), at 1–4 (1999 letter denying Mr. Collamore's request for a discharge upgrade and citing previous denials in 1973 and 1977); Mot. Ex. 8, at 6 (Mr. Collamore's 2014 request for a discharge upgrade).

[5]    Before the 2023 VA evaluation, a BOP clinician had found in 2021 that, according to a diagnostic tool, Mr. Collamore scored "within the highly probable range for suffering from PTSD." Gov't Resp. to Def.'s Mot. for Compassionate Release ("**Resp.**") (ECF No. 68) Ex. 1, at 3–4 (ECF No. 68-1); *see also* Resp. Ex. 3, at 50 (ECF No. 68-3) (BOP health records listing Mr. Collamore's health problems as of 2024, including PTSD); Movant's Resp. to the Gov't's Opp'n of His § 3582 Mot. for Compassionate Release 6 (ECF No. 71) (referencing disability benefits Mr. Collamore has received from the VA).

Mr. Collamore filed his present motion pro se on August 5, 2024. He supplemented that motion with the assistance of counsel on February 21, 2025. Def.'s Suppl. Mot. for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c) ("**Suppl. Mot.**") (ECF No. 76).

## LEGAL STANDARD

The compassionate release[6] statute lets me grant prisoner-initiated motions once movants " 'fully exhaust' their administrative remedies with the BOP." *United States v. D'Angelo*, 110 F.4th 42, 48 (1st Cir. 2024) (quoting 18 U.S.C. § 3582(c)(1)(A)). Once exhaustion is satisfied or waived, I may grant compassionate release only if it is: (1) warranted by "extraordinary and compelling reasons"; (2) consistent with the United States Sentencing Commission's "applicable policy statements"; and (3) consistent with the factors listed in 18 U.S.C. § 3553(a) ("**Section 3553(a)**"). 18 U.S.C. §§ 3582(c)(1)(A); *see also D'Angelo*, 110 F.4th at 48 (outlining "three steps").

Concerning the second step, the Sentencing Commission's current policy statement (the "**Policy Statement**") lists several "extraordinary and compelling" reasons for relief, including the defendant's age, medical circumstances, family circumstances, unusually long sentence, or abuse suffered in prison. U.S. Sent'g Guidelines Manual ("**U.S.S.G.**") § 1B1.13(b) (U.S. Sent'g Comm'n 2024). The Policy Statement also contains a "catchall" provision that allows courts to grant

---

[6]    Following the First Circuit, I use the terms "compassionate release" and "sentence reduction" interchangeably throughout this order. *United States v. Ruvalcaba*, 26 F.4th 14, 17 n.1 (1st Cir. 2022) (internal citation omitted); *see also United States v. Trenkler*, 47 F.4th 42, 45, 46 (1st Cir. 2022) (noting that although 18 U.S.C. § 3582 is commonly known as the "compassionate release statute," it "governs sentence reductions generally").

compassionate release based on "any other circumstance or combination of circumstances" that are "similar in gravity" to the other enumerated bases. *See* U.S.S.G. § 1B1.13(b)(5). The catchall provision recognizes that judges are "in a unique position to determine whether the circumstances warrant a reduction." U.S.S.G. Suppl. to App'x C, Amendment 814, at 207 (U.S. Sent'g Comm'n 2023).[7]

It is the movant's burden to show that extraordinary and compelling reasons exist. *United States v. Galiany-Cruz*, No. 22-1196, 2023 WL 6458535, at *1 (1st Cir. June 6, 2023) (citing *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021)). In determining whether such reasons exist, I am " 'logically guided by the plain meaning of those terms.' " *United States v. Rodriguez-Pena*, 108 F.4th 12, 17 (1st Cir. 2024) (quoting *United States v. Ruvalcaba*, 26 F.4th 14, 23 (1st Cir. 2022)). A reason is extraordinary if it is " 'beyond the mine-run either in fact or in degree,' " and it is compelling if it is " 'both powerful and convincing.' " *Id.* (quoting *United States v. Canales-Ramos*, 19 F.4th 561, 566–67 (1st Cir. 2021)). The First Circuit instructs me to review the "holistic context" of a defendant's motion and consider the entire "complex of circumstances," keeping in mind that "the whole may be greater than the sum of its parts." *D'Angelo*, 110 F.4th at 48–49 (quoting *United States v. Trenkler*, 47 F.4th 42, 49–50 (1st Cir. 2022)).

---

[7]    *See also* U.S. Sent'g Guidelines Manual 2024 Suppl. to App'x C, Amendment 814, at 207 (U.S. Sent'g Comm'n 2023) (guidance regarding "extraordinary and compelling" circumstances "is best provided by reviewing courts, rather than through an effort by the [Sentencing] Commission to predict and specify in advance all of the grounds on which relief may be appropriate").

## DISCUSSION

There is no dispute that Mr. Collamore exhausted his administrative remedies by submitting a request for sentence reduction to the BOP on April 1, 2024, which the BOP denied on April 9, 2024. Mot. Exs. 2 & 3 (ECF Nos. 63-2 & 63-3); *see also* Resp. 4. The only questions are whether he establishes "extraordinary and compelling reasons" and whether the Section 3553(a) factors support his release. Mr. Collamore meets both requirements.

## I.    Extraordinary and Compelling Reasons

### A.    Other Reasons "Similar in Gravity"

In evaluating Mr. Collamore's case, I considered four separate Policy Statement provisions. First, a medical condition, impairment, or age-related physical or mental health deterioration may warrant early release if the defendant "is not expected to recover" and if the condition "substantially diminishes" his ability to "provide self-care" in prison. U.S.S.G. § 1B1.13(b)(1)(B). Second, a medical condition may warrant release if it "requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." *Id.* § 1B1.13(b)(1)(C). Third, age-related health conditions may warrant release for a defendant who is at least sixty-five, has served at least ten years or seventy-five percent of his sentence, and is experiencing "serious deterioration in physical or mental health." *Id.* § 1B1.13(b)(2). Fourth, a defendant may be eligible for release after serving at least ten years of "an unusually long sentence" if there has been a relevant "change in the law." *Id.* § 1B1.13(b)(6).

Although Mr. Collamore's case does not fall neatly into any of these categories, I find he satisfies the Policy Statement's catchall provision. For three reasons, he presents a "combination of circumstances" that are "similar in gravity" to those listed under the Policy Statement and therefore qualify him for compassionate release. *See* U.S.S.G. § 1B1.13(b)(5).

### 1.    Need for Specialized Trauma Treatment

The circumstances surrounding Mr. Collamore's need for trauma treatment are compelling. Consistent with the Policy Statement's "specialized medical care" provision, *see* U.S.S.G. § 1B1.13(b)(1)(C), Mr. Collamore has shown that his PTSD symptoms require "specialized" treatment. Suppl. Mot. 5, 6; PSR ¶ 11. To establish eligibility for relief under that subsection, Mr. Collamore would also have to show both that (1) the lack of PTSD treatment puts him at risk of "serious deterioration"; and (2) that treatment is "not being provided" by BOP. *See* U.S.S.G. § 1B1.13(b)(1)(C). The Government contests both points. *See* Resp. 7–8.[8] But I find I can decide Mr. Collamore's case without resolving those issues because, for various reasons, his need for specialized mental health treatment is similar in gravity to the other circumstances enumerated by the Policy Statement.

---

[8]    Mr. Collamore says that specialized PTSD treatment is unavailable within the BOP. Def.'s Suppl. Mot. for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c) ("**Suppl. Mot.**") 4 (ECF No. 76). The Government responds that there are three mental health specialists at the low-security facility of FCI Coleman where Mr. Collamore is currently incarcerated and that some BOP facilities offer a specialized trauma treatment program. The Government acknowledges that because Mr. Collamore's current facility does not offer this program, Mr. Collamore would have to seek a transfer to a different facility. *See* Gov't's Resp. to Def.'s Suppl. Mot. for Sentence Reduction 2–3 (ECF No. 81). The United States Probation Office confirmed that to enroll in treatment, Mr. Collamore would have to move from his current low-security placement either to FCI Coleman's medium-security facility or to a different prison altogether. I assume that transferring to a new prison would move Mr. Collamore farther from his supportive relatives who live nearby in Ocala, Florida. *See* Suppl. Mot. 5.

First, the record before me reflects the apparently unanimous agreement—of Mr. Collamore, the Government, the Probation Office, and multiple mental health professionals—that Mr. Collamore's persistent escape offenses are a symptom of his untreated trauma disorder. The record indicates a similar explanation for his repeated burglary and theft conduct, which he appears to have committed not out of greed or malice but rather out of desperation and a need to survive. It seems plausible that had Mr. Collamore received appropriate medical treatment, he would not have remained in the cycle of destructive behavior that led to his increasingly severe prison sentences.

Second, Mr. Collamore's diagnosis and treatment were delayed for decades at least in part because of his military discharge status, which was only recently corrected.

Third, even if mental health treatment exists for Mr. Collamore in prison, the care available through the VA's intensive inpatient and outpatient programs—geared specifically toward people with trauma from combat exposure—exceeds anything available in federal custody. *See* Movant's Resp. to the Gov't's Opp'n of His § 3582 Mot. for Compassionate Release 5 (ECF No. 71).

Fourth, the nature of Mr. Collamore's PTSD symptoms might make it challenging for him to meaningfully benefit from treatment while in prison. Mr. Collamore has maintained an impeccable disciplinary record for the last twelve years of his incarceration, which reflects his ability to succeed in his current environment. By contrast, he has historically struggled in more "ambiguous" custody situations,

11

such as the halfway house he fled in 2010. Mr. Collamore may stand to benefit from treatment to a greater degree if he receives it while actively navigating the challenges he might encounter upon reentry.

Finally, to access appropriate mental health treatment within the BOP, Mr. Collamore would need to transfer from his current low-security placement to a more secure facility at FCI Coleman or move to a new BOP institution. *See supra* n.8. In both cases, transferring would require Mr. Collamore to leave behind the routine and relationships he has established in his current setting and start over somewhere new. A transfer to a new institution would likely move him farther from his family in Florida. The stress of such a transition, particularly at Mr. Collamore's age, would likely come at a cost to his mental health.

Accordingly, Mr. Collamore's need for specialized PTSD treatment contributes to the extraordinary and compelling nature of his case, a conclusion consistent with precedent from other jurisdictions.[9]

### 2.    Age-Related Health Conditions

Mr. Collamore's advanced age and numerous age-related physical health conditions are also part of the extraordinary and compelling reasons for release. Mr. Collamore has multiple documented diagnoses including hyperlipidemia, hypertension, kidney disease, hypothyroidism, and testicular dysfunction. Resp. Ex.

---

[9]    *See, e.g.*, *United States v. Huber*, No. 05-cr-478-WJM, 2024 WL 4665457, at *3 (D. Colo. Nov. 4, 2024) (granting early release where the BOP was not addressing the defendant's PTSD "through counseling, group therapy, or medication," whereas "the V.A. could do much to help" the defendant if released); *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, at *2–3 (N.D. Ohio Oct. 17, 2019) (granting early release to a decorated army veteran whose "originally undiagnosed" and untreated PTSD led to his crimes).

3 (ECF No. 68-3). The Government contends that Mr. Collamore does not satisfy the health-related Policy Statement provisions because his conditions do not "substantially diminish[ ]" his ability to provide self-care in prison or amount to "serious deterioration." Resp. 6–7 (discussing U.S.S.G. §§ 1B1.13(b)(1)(B), (b)(2)); Suppl. Resp. 1–2. As above, I need not decide those issues because Mr. Collamore's conditions are "similar in gravity" to those that the Policy Statement recognizes as extraordinary and compelling grounds for release. U.S.S.G. § 1B1.13(b)(5).

First, Mr. Collamore meets many of the health-related Policy Statement criteria. At seventy-five, he is ten years above the minimum age requirement for the age-related Policy Statement provision, and he has exceeded the requirement to serve at least ten years or seventy-five percent of his sentence. PSR at 1–2; J. in a Criminal Case; U.S.S.G. § 1B1.13(b)(2). I also find he is "not expected to recover" from his various medical conditions. *See* U.S.S.G. § 1B1.13(b)(1)(B). In 2021, Judge Singal had already found that Mr. Collamore needed "medical care for various physical conditions . . . tied to the aging process," 2020 CR Order 3, and now over four years later, those conditions have progressed. Given Mr. Collamore's age and the nature of these diagnoses, I assume his health will only worsen over time.

Second, without compassionate release, Mr. Collamore will leave prison in just over two years. At age seventy-five, two years make a big difference. The sooner Mr. Collamore is released, the more likely it is that he will be healthy enough to make use of his time outside prison.

Mr. Collamore's age and medical conditions therefore contribute to the extraordinary and compelling reasons for release.

### 3.    Unusually Long Sentence

Another relevant circumstance is Mr. Collamore's "unusually long" sentence. I consider his sentence unusually long given various factors that mitigate the seriousness of his underlying crimes. For example, as already discussed, Mr. Collamore's escape offense was linked to his untreated trauma disorder. In addition, his firearm offense that triggered enhanced sentencing under the ACCA entailed his possession of a gun that he voluntarily disclosed to law enforcement and never used. Finally, none of the predicate burglary offenses that led to the application of a fifteen-year mandatory minimum involved any actual or attempted physical injury to any victim. *See* PSR ¶¶ 37–62.

Mr. Collamore is serving a prison term that is severe relative to his underlying conduct, and he has already served a large proportion of that sentence. This contributes to the extraordinary and compelling nature of his case. *Cf. United States v. Cromitie*, No. 09 CR 558-01 (CM), 2024 WL 216540, at *6 (S.D.N.Y. Jan. 19, 2024) (granting compassionate release and noting that "the severity of a defendant's sentence relative to his actual criminal behavior may, under certain circumstances, present an extraordinary and compelling reason").

### 4.    Overall Assessment

I need not decide whether any one circumstance described above would warrant compassionate release. Instead, I consider all of Mr. Collamore's circumstances as part of a holistic analysis. *See D'Angelo*, 110 F.4th at 48−49. I find

14

that, in the overall context of Mr. Collamore's case, his belatedly diagnosed and mostly untreated PTSD, the causal relationship between that disorder and his crimes, his advanced age and declining health, the nature of his offenses relative to his long sentence, and the percentage of that sentence he has already served, cumulatively amount to circumstances "similar in gravity" to those enumerated under the Policy Statement.

Taken together, Mr. Collamore's circumstances are "beyond the mine-run either in fact or in degree" and are "both powerful and convincing." *Rodriguez-Pena*, 108 F.4th at 17 (citation omitted). Mr. Collamore has therefore established extraordinary and compelling reasons for compassionate release.

### B.    Rehabilitation

Mr. Collamore's prison disciplinary record and evidence of rehabilitation add further weight to that conclusion. While rehabilitation cannot be the sole basis for granting compassionate release, I may consider it in "combination" with other factors as part of reviewing the defendant's "individualized circumstances, taken in the aggregate." *Trenkler*, 47 F.4th at 47–48.

Mr. Collamore has not had a single disciplinary incident in twelve years. Reply to Gov't's Resp. to Suppl. Mot. for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c) ("**Reply**") 3 (ECF No. 82). Beyond staying out of trouble, he has made productive use of his time in prison, for example, by taking over thirty courses on topics including construction math, horticulture management, and financial responsibility. Mot. 8; Mot. Ex. 12 (ECF No. 63-12). He has maintained stable employment in the BOP for over nine years and earned a leadership position that comes with "the highest

15

available pay grade." Mot. 9. And beyond committing himself to rehabilitation and self-improvement, he has also distinguished himself as a leader and conscientious community member, qualities that will serve him well during reentry. His supervisors praise his "tremendous work ethic" and "strong leadership skills," and they describe him as "honest," "helpful," and "willing to train others." Mot. Ex. 13, at 1 (ECF No. 63-13). According to one BOP supervisor, Mr. Collamore is ready to be a "contributing member of the community" and "will make the most of any chance he may be given." Mot. Ex. 13, at 1. This strong evidence of rehabilitation strengthens Mr. Collamore's case for release.

### C.    Release Plan

Finally, Mr. Collamore has submitted a comprehensive release plan, *see* Reply Ex. 1 (ECF No. 82-1), which a probation officer familiar with Mr. Collamore's case has called the most thorough plan he has seen in his twenty-year career. By presenting this plan, Mr. Collamore has squarely addressed Judge Singal's concern about Mr. Collamore's "lack of a detailed plan to address his mental health," which Judge Singal cited as a reason for denying Mr. Collamore's first request for compassionate release. 2020 CR Order 3.

Under Mr. Collamore's detailed plan, he will live with his niece and her husband in their four-bedroom house in Ocala, Florida. As soon as Mr. Collamore receives a release date, he will be placed on the waiting list for inpatient PTSD treatment from the VA. Suppl. Mot. 5. When not in the inpatient program, he will participate in the VA's intensive outpatient PTSD treatment. Suppl. Mot. 5. Mr. Collamore's niece says that she has confirmed with the local VA office that Mr.

Collamore can meet with a doctor within ten days of his release to set up a treatment plan and that there are currently openings in the inpatient program. She also testified that a close family friend and neighbor, a Vietnam veteran who receives services at the local VA office, has offered to transport Mr. Collamore to his VA appointments if Mr. Collamore's niece and her husband are unavailable.

In addition to a plan for obtaining mental health treatment, Mr. Collamore also proposes a living situation that will set him up for success. Mr. Collamore's niece testified that because her husband is a correctional officer at a Florida prison, they understand the supervision conditions (including the requirement to "participate in mental health treatment," PSR at 25) that will apply to Mr. Collamore when he is released. The couple has already prepared a bedroom and private bathroom for Mr. Collamore, which they renovated to ensure that the facilities remain accessible to him as he ages. They have also set up a shed behind the house where Mr. Collamore can practice woodworking. I agree with Mr. Collamore that he has proposed "a stable, loving, supportive environment which will be conducive to successful treatment." Suppl. Mot. 5.

In sum, Mr. Collamore satisfies the first step of the compassionate release analysis. He has demonstrated extraordinary and compelling reasons for release based on the circumstances discussed above. And those circumstances are further

bolstered by Mr. Collamore's evidence of rehabilitation and his thorough release plan.[10]

## II.    Section 3553(a) Factors

The next step asks whether the proposed relief aligns with the sentencing factors under Section 3553(a). That provision "commands broadly" that a reduced sentence should "remain[ ] 'sufficient, but not greater than necessary.' " *D'Angelo*, 110 F.4th at 49 (quoting 18 U.S.C. § 3553(a)). Various factors are relevant here, including: (1) "the nature and circumstances" of Mr. Collamore's underlying offense; (2) his "history and characteristics"; (3) the need for his sentence to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment"; and (4) any risk posed to "the safety of any other person or to the community." 18 U.S.C. § 3553(a)(1)–(2), (5); U.S.S.G. § 1B1.13(a)(2).

I begin with Mr. Collamore's underlying offenses: escape from custody and possession of a firearm by a prohibited person. While those offenses are unquestionably serious, there is no indication in the record that Mr. Collamore used or threatened to use a firearm in his most recent conduct or on any previous occasion. *See* PSR ¶ 39 (1970 state conviction for carrying a concealed weapon); PSR ¶¶ 55–56 (1985 state and federal convictions for firearm possession). *Cf. United States v. Rodriguez*, 451 F. Supp. 3d 392, 406 (E.D. Pa. 2020) (granting compassionate release

---

[10]    *Cf. United States v. Jackson*, No. 1:06-cr-00134-JLT-1, 2025 WL 1255131, at *12 (E.D. Cal. Mar. 31, 2025) (granting release where the defendant's "rehabilitation and positive conduct [in prison] and relatedly his release plan, add[ed] cumulative weight to the extraordinary and compelling reasons" established).

to a firearm offender where "there was no evidence that he used the gun during the drug transactions or at any other time").

Next, I turn to Mr. Collamore's history and characteristics. Mr. Collamore's military service in Vietnam, his brother's suicide, and the abrupt death of his mother appear to have contributed to his development of a trauma disorder long before that condition was properly understood. It also appears that his untreated disorder then led to his persistent criminal behavior and repeated violations involving thefts and flight. This criminal behavior prompted a military discharge status that, despite his decorated service, disqualified him from VA treatment and benefits for almost fifty years. The same record that reflects his lengthy criminal history also contains considerable evidence of his good character and resilience. That evidence begins with his exceptional military service and extends to his exemplary prison disciplinary record.

Third, I consider the purposes of sentencing. I am satisfied that the twelve-year prison term Mr. Collamore has already served reflects the seriousness of his offense, promotes respect for the law, provides just punishment, and affords adequate deterrence. I note that Mr. Collamore's ACCA status disqualifies him from earning First Step Act credits, which could have reduced his sentence by three years (obviating his current request for a two-and-a-half-year reduction). Mot. 9; Mot. Ex. 14, at 2 (ECF No. 63-14). Mr. Collamore will be eligible for home confinement in two years. I agree with Mr. Collamore that "[s]erving the short remainder of his sentence would do little" to further the goals of sentencing, particularly given the availability

of critical PTSD-specific treatment at the VA and the difficulties associated with getting comparable treatment from the BOP. Suppl. Mot. 3.

Fourth, I conclude that Mr. Collamore is unlikely to be a danger to the community if released. *See* U.S.S.G. § 1B1.13(a)(2). His advanced age, medical conditions, rehabilitation, and family support suggest a very low risk of recidivism, which the BOP has recognized by housing him at a low-security facility and giving him "low" scores for recidivism and violence. Mot. 9; Mot. Ex. 14, at 5. Moreover, unlike when Mr. Collamore sought compassionate release five years ago, he now has a detailed release plan that outlines specific resources to facilitate his reentry. To the extent Mr. Collamore's trauma disorder creates the risk that he will resume his old habits of burglary and theft, that risk is alleviated by the intensive mental health treatment he will obtain upon release and the disability benefits he will continue receiving from the VA. Finally, the supervised release conditions (including mandatory mental health treatment, *see* PSR at 25) that will apply for the next five years give further assurance that Mr. Collamore will not threaten the safety of any person or the community when he is released.

Accordingly, extraordinary and compelling reasons justify Mr. Collamore's immediate release, and a sentence of time served is consistent with the Section 3553(a) factors.

## CONCLUSION

For these reasons, Mr. Collamore's motion for compassionate release is **GRANTED**.

Mr. Collamore's release is **STAYED** until the Probation Office has completed a home inspection of Mr. Collamore's proposed residence. The Probation Office is **ORDERED** to complete that inspection by the earliest date practicable and no later than June 20, 2025. During this time, the Probation Office is also directed to coordinate with the BOP, Mr. Collamore, his family, and the VA clinic in Ocala, Florida, to schedule an intake appointment for Mr. Collamore as soon as possible following his release.

The Probation Office is **ORDERED** to submit a status report to this Court concerning these activities as soon as completed and by no later than June 20, 2025.

Accordingly, Mr. Collamore's prison term is reduced to time served, plus the period for the Probation Office's home inspection. Mr. Collamore's original five-year term of supervised release will begin upon his release from imprisonment, and all other aspects of his sentence, including all supervision conditions, are unchanged.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 22nd day of May, 2025.